# THE OGLESBY COAL COMPANY

*v.*

# HENRY PASCO *et al.*

1. STATUTE OF WILLS—*construction of, relating to kindred of half-blood.* The section of the Statute of Wills which provides that in "no case shall there be a distinction between the kindred of the whole and the half-blood," is not confined, in its application, to cases where the ancestor, from whom the estate is derived, leaves children by different mothers. The children of the same mother, but who have different fathers, are no less brothers and sisters of the half-blood than are the children of a common father, but who have different mothers, and all are equally within the operation of the statute.

2. INJUNCTION—*by tenant in common, to restrain another from selling intoxicating liquors on premises owned in common.* On a bill filed by one tenant in common of certain premises to restrain a co-tenant from keeping a saloon and selling intoxicating liquor on the premises, where it was not alleged that the complainant suffered any special injury to his property, not suffered in common by the public, it was *held,* that an injunction could not be granted, and that, even if the complainant had suffered such injury, it should appear by the bill, to justify a court of equity to interfere by way of injunction, that the continuance of the injury was threatened and its danger imminent.

3. ESTOPPEL—*married woman can only be estopped from denying truth of her representations in cases of tort.* A married woman may preclude herself from denying the truth of her representations, but only in the case of pure torts. If her conduct is so connected with contract that the action sounds in contract, there can be no estoppel.

4. A married woman who makes a verbal agreement to release all her interest in certain real estate, and, in consideration thereof, receives a conveyance of other real estate, but suppresses no material facts nor makes any false representations in regard to the matter, is not estopped from claiming her interest in the real estate which she agrees to release, and the contract can not be enforced against her, because she is not competent to make it.

APPEAL from the Circuit Court of LaSalle county; the Hon. EDWIN S. LELAND, Judge, presiding.

Mr. D. EVANS, and Mr. G. S. ELDRIDGE, for the appellant.

Messrs. BUSHNELL, BULL & GILMAN, and Mr. JAMES W. DUNCAN, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was a bill in equity, exhibited by appellant, against appellees, in the court below, praying that a deed from Abigail Pepson and her husband, for a certain tract of twelve and one-half acres of land in La Salle county, to appellee Elizabeth Pasco, be set aside; that appellees be restrained from interfering with appellant's possession of the premises, and from keeping a saloon and selling whisky, beer and other intoxicating liquors thereon, and, also, that they be required to remove from the premises a certain building placed thereon by them for the purposes of a saloon.

A demurrer was sustained to a second amended and supplementary bill, and, the preliminary injunction having been previously dissolved, damages were assessed thereon at $50, and the bill dismissed.

Appellant claims, under John Corrigan, by virtue of a contract between him and Barbara Shalton, of which it is assignee, an equitable title to the whole property, conditional upon making a certain payment, and by deeds from certain other persons, as heirs at law of Mary Fell, the legal title to the undivided six-eighths of the whole property.

The principal questions presented, relate to the sufficiency of this bill.

One Patrick Fell was seized in fee of the property, and died intestate, leaving as his sole heir at law Thomas Fell. He subsequently died intestate, while seized in fee of the property, leaving no child or children, nor descendants of child or children, surviving him. He left, however, his mother, and certain half-brothers and sisters, on her side, and the question first presented is, whether she takes as sole heir, to their exclusion.

Appellant claims that she does; that so much of the 46th section of the Statute of Wills (Gross' Stats. 1869, p. 805) as provides, "in no case shall there be a distinction between the kindred of the whole and the half-blood," applies only to cases where the ancestor from whom the estate is derived leaves children by different mothers. It is a sufficient answer to this, that the language of the statute warrants no distinction, and it is too plain for construction. Counsel for appellant are mistaken in assuming that the Statute of Descents in Virginia is the same as the language of the ordinance of 1787, and of our statute, in relation to kindred of the whole and the half-blood. See Va. Code of 1849, ch. 123, p. 552. And the preference given, both in Virginia and Tennessee, to kindred of the whole over those of the half-blood, referred to by counsel, is by virtue of statute. See Code of Va. *supra;* Tennessee Code of 1858, p. 476, secs. 2420–2425. Whether the mother shall inherit to the exclusion of brothers and sisters, or conjointly with them, or whether the brothers and sisters of the half-blood shall inherit equally with those of the whole-blood, or otherwise, are questions of legislative policy, with which we have nothing to do.

Our statute does not follow the common law rule in this respect, but declares, as it was certainly competent the General Assembly should, that "there shall be no distinction between the kindred of the whole and the half-blood." Surely those who are children of a common mother, but have different fathers, are no less brothers and sisters of the half-blood than those who are children of a common father, but have different mothers. Had it been designed that only those were intended who were of the same blood as the ancestor from whom the estate descended, why was it not so said? It would be in violation of all principle to construe language, the meaning of which is so apparently plain and obvious, as subject to the implied qualification contended for.

It is alleged that, during the last illness of Mary Fell, the mother of Thomas Fell and of his half-brothers and sisters,

among whom are included John Corrigan and Abigail Pepson, a family consultation was had between Mary Fell and John Corrigan, and his brothers and sisters, including Abigail Pepson, in reference to the disposition of the premises of which Thomas Fell died seized, including, particularly, the twelve and one-half acres of land in controversy, and, also, a certain lot in the city of LaSalle, the title to which, it was then believed by them, was vested in Mary Fell, as the sole heir of Thomas Fell; that at such consultation it was arranged and mutually agreed between Mary Fell and her children, and particularly between her, John Corrigan and Abigail Pepson, that Mary Fell should convey the said twelve and one-half acres of land to John Corrigan, as and for his portion of the supposed estate, upon the condition that he would take care of and maintain an infirm brother during his lifetime, who was suffering from a pulmonary disease, which was considered incurable; that, in pursuance of such mutual agreement, Mary Fell did convey, on the 4th day of May, 1865, said twelve and one-half acres of land to John Corrigan, and John Corrigan did take care of, support and maintain, from the time of the agreement, the said infirm brother, during his lifetime and until his death, and, in so doing, expended much more than the value, at that time, of the twelve and one-half acres of land; that it was, at the time of said family arrangement and agreement, also further agreed that Mary Fell should convey to Abigail Pepson, as and for her portion of the real estate, the said lot in the city of LaSalle; that, to carry out and complete the arrangement and agreement, Mary Fell did, on or about the 4th day of May, 1865, execute and deliver to Abigail Pepson a deed for said lot; that Abigail Pepson then took possession of the lot, and has since held it, claiming to be owner, and that the other brothers and sisters of John Corrigan have, ever since such agreement and arrangement, consented to, and acquiesced in, the possession and ownership of said lot by Abigail Pepson; that Abigail Pepson received the deed for the lot

as and for her full share of the estate of which Mary Fell died seized, and that she then and there, and until the execution of the deed to Elizabeth Pasco, disclaimed all interest or right in and to the residue of the estate of which Thomas Fell died seized.

The bill also contains allegations that Corrigan took possession of the twelve and a half acres of land, upon receiving Mary Fell's deed therefor, and thenceforward held and possessed it, claiming to be the absolute owner of the whole of it, until he sold and agreed to convey it to Barbara Shalton, who, on making a contract for a deed therefor, took possession thereof, claiming to own the whole until her subsequent assignment of her contract to appellant, who has since had possession, claiming to own the whole. The question arising hereon is, whether, under these allegations, Abigail Pepson was estopped from claiming any interest, as heir at law of Thomas Fell, in the twelve and one-half acres.

The question must be determined with reference to the law in force in relation to the separate property of married women, at the time the interest descended to Abigail Pepson, and when the conveyances to John Corrigan and herself were made by Mary Fell, that is, the 4th day of May, 1865.

If Thomas Fell died, and Abigail Pepson was a married woman, before the law of 1861 in respect to the separate property of married women took effect, her husband was possessed of an estate, during coverture, in the property, which was not divested by that act. *Rose et al.* v. *Sanderson*, 38 Ill. 247. If, however, either Thomas Fell died or she was married subsequent to the taking effect of that act, and there was issue of the marriage, born alive, the husband was tenant of the property by the curtesy initiate. *Cole* v. *Van Riper*, 44 Ill. 65. But in no event was it competent for the wife to alienate her property, except by joining her husband in the execution of a deed for that purpose, acknowledged in due form of law. *Cole* v. *Van Riper, supra; Scovil* v. *Kelsey*, 46

Ill. 344; *Dean et al.* v. *O'Meara et al.* 47 id. 120; *Scovil* v. *Connell*, id. 277.

The affirmative was with the appellant, and it was incumbent on it to show, with certainty, such state of facts as necessarily precluded Abigail Pepson from making claim to the property. If Thomas Fell died, or she was married, subsequent to the passage of the act of 1861, or if she was unmarried when the deeds were made, on the 4th of May, 1865, it should have been so alleged. *Bauman, Admr.* v. *Street et al.* 76 Ill. 526; *Farrell* v. *Patterson*, 43 id. 52. It is alleged that Abigail Pepson was married; that her husband's name was Thomas Pepson, and the bill speaks of her, throughout all the transactions, as Abigail Pepson, and it is not shown whether Thomas Fell died before or after 1861. We are, then, authorized to assume that Abigail Pepson was a married woman, and that Thomas Fell died before 1861. This being so, it would seem to scarcely need argument to prove that it is not possible that both her and her husband's interest in the property could have been disposed of by a parol agreement of her's, to which it is not alleged he was a party, or has, in any manner, given his consent.

But even if her marriage or the death of Thomas Fell did not occur until after the act of 1861 in relation to the separate property of married women was in force, it being clear, from the allegations, that both occurred prior to the arrangement and agreement of 1865 set up as an estoppel, we can have no hesitancy in determining she was not bound by that arrangement and agreement.

"The weight of reason and authority," says Bigelow, in his work on Estoppel, p. 490, after a careful review of the adjudged cases, "seem to establish the proposition that a married woman may preclude herself from denying the truth of her representations, but only in the case of pure torts, and that, if her conduct is so connected with contract that the action sounds in contract, there can be no estoppel."

Thus, it has been held by this court, in *Schwartz et ux.* v. *Saunders*, 46 Ill. 18, and *Anderson* v. *Armstead*, 69 id. 452, that, where the wife fraudulently permitted her husband to represent himself as the owner of her separate property, and procure mechanics to make valuable improvements thereon, without disclosing her ownership or repudiating his authority, she is estopped, afterwards, from denying his authority to cause the improvements to be made, when the mechanics seek to enforce liens for payment of the amount due them for work done under the faith of the husband's authority.

But in *Moulton* v. *Hurd*, 20 Ill. 137, *Lindley* v. *Smith et al.* 58 id. 250, and *Hutchings et al.* v. *Huggins*, 59 id. 29, it was held, that a married woman can only alienate her real estate by joining with her husband in a deed for that purpose, acknowledged as required by statute, and that a court of equity has no power to reform her deed for any mistake in its provisions or in the certificate of acknowledgment. And in *Bressler et al.* v. *Kent*, 61 Ill. 426, it was held, the same doctrine is applicable to cases arising since the law of 1861 relating to the separate property of married women went into force, as well as before.

In *Spurck et al.* v. *Crook et al.* 19 Ill. 415, it was held, a married woman who has joined her husband in a contract, or who has contracted without her husband, will not be made to convey her real estate, nor does she in that way release her dower; and joining with her husband in an agreement to arbitrate does not affect her rights. She can not be made to perform an award.

And *Rogers* v. *Higgins et al.* 48 Ill. 212, is a still stronger case in illustration of the question before us. It was there held, as is correctly shown by the syllabus, that "a married woman attempting to sell her real estate without authority, is not estopped, afterwards, to assert her title because she received the value of the land as purchase money. Nor can a court of equity hold that a married woman who so acts without suppressing material facts, and has made no false

representations to induce the purchase, is guilty of such a fraud as will estop her from asserting her title, notwithstanding her void deed.  The law presumes that one dealing with a person under disability, and knowing the fact, intends to incur the consequence of his acts. and equity will not relieve him against them, or otherwise afford relief."

These cases fully illustrate and sustain the distinction quoted from Bigelow.  In the first two cases, the ground of relief was tort; in the other cases, relief was denied because the conduct of the wife was so connected with contract that the action, or proceeding, sounded in contract.

It will have been observed the allegations here fail to charge Abigail Pepson with fraud.  It is neither alleged that she concealed the knowledge of, or misrepresented any material fact.  John Corrigan was, for aught that appears, fully advised of every fact relating to the property and her interest therein, of which she had knowledge.  He knew she was a married woman, and is presumed to have known the legal disabilities under which she consequently labored.  The arrangement, or agreement, was but a contract, if anything, and any obligations arising out of it could only be enforced as originating in contract.  There was, then, no estoppel, and specific performance of the contract could not be enforced against Abigail Pepson, because she was not competent to make such a contract.

The bar of the Statute of Limitations attempted to be set up is not authorized by the facts in evidence.

The remaining questions relate to the portion of the bill praying for an injunction.  So far as the building is concerned it is alleged it is already removed.  If this was in violation of the writ of the court below, the parties removing should have been there attached and dealt with for the contempt.  With that, however, the bill before us is not concerned.  It does not appear, from the allegations of the bill, that there is anything in the nature of the building, discon-

nected from the use to which it may be applied, from which it can be pretended irreparable injury will result to appellant, as co-tenant with appellees, from permitting the building to remain where it is. For this, the law affords an adequate remedy by action of trespass. The allegation touching its use as a saloon is as follows : That appellees " very recently, and until the 15th of February last, kept a saloon and place for selling spirituous liquors and beer. and as a place where disorderly persons were in the habit of congregating, for the purpose of selling liquors and beer to the miners of appellant." There is no allegation of any special injury done to appellant's property by reason of disorderly persons congregating at the saloon. There is no allegation that appellees were not legally licensed to sell liquors, and it is not shown that a sale by them to the miners of appellant would be in contravention of any legal right of appellant.

We are unable to see why the enforcement of the criminal code with respect to this saloon will not afford appellant all the protection to which it is entitled as against real or imaginary evils from that source. Manifestly, unless appellant suffers from the saloon some special injury to its property, not suffered in common by the public—some substantial violation of its legal rights, and not a mere theoretical or fanciful wrong—it has no cause to complain. Moreover, even if it had in the past. suffered such injury, it should appear, to justify a court of equity in interfering by way of injunction, that the continuance of the injury is threatened and its danger imminent, which the bill omits to allege.

We see no sufficient objection to the assessment of damages on dissolution of the injunction. The suggestions in writing, filed on the dissolution, are for solicitors' fees, and personal expenses in attending court, in order to procure the dissolution, and the decree shows the amount proved under these suggestions was $50. It does not appear that the amount decreed was, as is insisted by appellant, of the court's own volition ; but the record shows the filing of the sug-

gestions in writing by the solicitors of appellees, and that evidence was heard on those suggestions.

Our conclusion is, there is no substantial error in the record, and the decree will therefore in all things be affirmed.

*Decree affirmed.*